Filed 10/28/13  In re Joseph C. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JOSEPH C., a Person Coming Under the Juvenile Court Law. | B246596 (Los Angeles County Super. Ct. No. CK74712) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROBERTO C. et al., <br><br> Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra Losnick, Juvenile Court Referee.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Roberto C. (Father).

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant Josephine C. (Mother).

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

A mother and father appeal from the dependency court's termination of their parental rights as to their son, following a five-year history of both parents' failure to address the sexual abuse and domestic violence that had led to his removal from their custody. The mother also challenges the dependency court's summary denial of her petition for modification of the court's prior orders. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

In September 2008, on behalf of Joseph C. (then 3 years old) and Justine C. (then 14), the Department of Children and Family Services (Department) filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b), (d) and (j), alleging their parents Roberto C. and Josephine C. had a 14-year history of domestic violence, including physical and sexual assaults by Roberto against Josephine; Roberto had physically abused Joseph and Justine, striking their faces and kicking them; Josephine had failed to protect the children from their father's abuse; Roberto had sexually abused Justine by fondling her breasts and vaginal area as well as digitally penetrating her; and Joseph was at risk of harm as a result of Roberto's sexual abuse of Justine. (All further undesignated statutory references are to the Welfare and Institutions Code.)

When the petition was filed, the children were in a confidential domestic violence shelter with Josephine. Upon receipt of an immediate referral for the family, an emergency response worker with the Department met with Josephine and the children at the Mission Hills Police Station. Josephine had contacted law enforcement to report that Roberto had touched Justine's vagina; after police officers interviewed the family, they had been taken into protective custody.

Roberto and Josephine had been married for 15 years and had emigrated from the Philippines 4 years earlier. Josephine told the social worker she worked several nights a week, and the children would be home alone with Roberto. Between August 3 and

2

August 11, 2008, Josephine said, Justine disclosed that Roberto had started sexually abusing Justine while Josephine was at work. Justine told Josephine Roberto would come into the bathroom while she was bathing and touch her breasts. Justine said the first time Roberto had sexually abused her was on July 19, 2008, shortly after her 14th birthday. On September 5, Justine told Josephine Roberto had touched her vagina the night before. At that time, Josephine called the police.

During her interview, Josephine told the social worker she and Roberto had a long history of domestic violence, and when she and the children came to the United States, the abuse escalated. Roberto screamed at Josephine in front of the children on a daily basis; on three different occasions, he threatened her with a knife and had "poked" her with a knife; he threatened her almost every other day and he slapped and kicked the children.

During her interview with the social worker (consistent with her statements to law enforcement), Justine confirmed Roberto had sexually abused her, reporting her father had come into the bathroom on two occasions while she was taking a shower and touched her breast. She said he also touched her vagina and buttocks at least five times. Roberto also touched her inner thighs and, on one occasion, kissed her on the lips while her mother was sleeping. On September 4, Justine said, Roberto came into her bedroom and touched her vaginal area under clothes. Before that, she said, he had touched her vagina over her underwear. She said the sexual abuse occurred mainly at night.

Justine also reported Roberto would yell at Josephine every day and had threatened to kill her. She had witnessed Roberto kick and hit her mother and said he hit and kicked her (Justine) as well as Joseph. She was afraid of Roberto.

With the help of law enforcement, Josephine applied for an emergency protective order and later filed for a temporary restraining order against Roberto.

3

When Roberto was interviewed several days later, he denied any sexual abuse and said Josephine was coaching Justine to make the allegations as "an excuse to leave him." He acknowledged they had a "contentious relationship" but denied any physical violence.

Josephine (but not Roberto) appeared for the initial detention hearing in September. The dependency court ordered the children detained from Roberto, ordered monitored visits for him and released the children to Josephine with family maintenance services for her and the children.

In mid-October, the Department filed for a protective custody warrant for the children and an arrest warrant for Josephine, which the dependency court granted. Ten days earlier, it was reported that Josephine and the children had left the domestic violence shelter the day before and had not returned.

The following week, the Department filed an amended petition, adding the allegation Josephine had abducted the children while staying at a domestic violence shelter and remained at large. The Department also filed a Jurisdiction/Disposition report, recommending family reunification services and monitored visitation for both parents.

In late October, the Sheriff's Department transported Josephine to the dependency court and the court confirmed the children were safe and in the Department's custody. The children were ordered detained and a pretrial resolution conference was set for mid-November. At the time set for the conference, the Department's dependency investigator attempted to interview Josephine, but she refused to speak without her attorney present. Roberto denied any domestic violence and said he had never raped Josephine. He denied physically abusing the children and refused to discuss the sexual abuse allegations without his attorney present.

Roberto said he discovered Josephine's whereabouts when he was in his car, stopped at a red light, when he saw Joseph crossing the street. He said he pulled over and Josephine and Joseph got into his car right away; he said Josephine had decided she did

4

not want to stay at the shelter. Later, Joseph said, they picked up Justine when her school day ended, and she was glad to see him. Roberto said he took his family to a family friend's house but went to a paternal aunt's home to avoid further accusations. However, he then moved into the same home as Josephine and the children but said he was never left alone with Justine and was honoring the dependency court's order to keep his distance from her.

When Justine was interviewed again, she denied Roberto and Josephine ever hit each other, denied Roberto hit her, denied he had touched her in a way that made her uncomfortable and said if he was affectionate with her, it was in an appropriate manner. She denied anyone had told her to change her answers.

At the November hearing, the dependency court set an adjudication hearing for January 2009, and a prerelease investigation hearing for placement with a paternal aunt (O.D.). Roberto and Josephine were to have monitored visits three times or three hours per week. The children were placed with O.D. at the end of November.

In January, the Department submitted a copy of Justine's SCAN Evaluation, a forensic sexual abuse examination conducted in December. According to the report, Justine told the evaluator Roberto had touched her thighs, chest, legs and underwear over her clothing while Josephine was not home; she declined a vaginal examination. She said Roberto found them at the shelter, and the police found them two or three weeks after that. She said she witnessed domestic violence between her parents and it made her sad and scared. The adjudication hearing was continued.

At the continued adjudication hearing in April, the dependency court heard Justine's testimony in chambers. She said she had told her mother in August 2008 that Roberto had molested her. She said she told Josephine he had touched her chest when she was showering and touched her on her underwear, almost on her vagina. She said Josephine did not do anything when Justine told her about the touching the first time, but called someone after Justine told her the second time. She acknowledged she had told the

5

social worker at the police station her father had touched her and kicked her and her mother. She had also told the police officer at the police station her father had touched her.

Justine testified she, Joseph and their mother went to the shelter after they left the police station but left when Roberto picked them up and never returned to it. When they went to their relative's home, Roberto, Josephine and Joseph slept in one room and Justine slept in another room alone. After she left the relative's home and went into emergency foster care, Justine testified, she told a social worker Roberto had not touched her; after being placed with O.D., she also told a social worker over the phone she did not remember telling her mother Roberto had touched her breasts. She said she told him that because his questions made her uncomfortable and she did not want to talk to anyone at that time.

Justine then denied Roberto had touched her and said she had told her mother he had because she wanted her father's attention. She said living in the shelter was hard on her mother. After Roberto picked them up there, Roberto asked her "why was [she] doing that so like [she] explained to him." She said he told her he was "always there for [her]." When they took her and her brother to a foster home, Justine testified, she "felt really bad about it, so [she] wanted to change it back." She believed it was her fault the police had come and taken them to foster care.

The dependency court stated it did not believe Justine's recantation and sustained the first amended section 300 petition as further amended. After striking the allegation Roberto had digitally penetrated Justine and finding both parents (not only Josephine) had abducted the children, the dependency court found the domestic violence and sexual and physical abuse allegations true. The court declared Justine and Joseph dependents, removed them from their parents' custody and ordered reunification services, with both Roberto and Josephine to participate in parenting education classes, Josephine to participate in individual counseling to address case issues, domestic violence and sexual

6

abuse awareness and Roberto to participate in individual counseling to address case issues, domestic violence and sexual abuse for predators. Visitation remained monitored with the Department to have discretion to liberalize. The matter was continued for a six-month review hearing.

In October, the Department filed its status review report. The children remained with O.D. The social worker transported Justine to counseling every week and reported Justine did not want to talk about anything that happened in the past because did not want to get anyone in trouble. O.D. said she could no longer care for the children.

Josephine's therapist (Virginia Baldioli) expressed concern for Josephine and believed she was afraid of Roberto. Josephine would only speak in a whisper and said she could not do anything against Roberto. Ms. Baldioli did not believe Josephine would be able to keep her or the children safe even if she left Roberto. Josephine was participating in individual therapy with Alfonso Calabrese. He also expressed concern about Josephine's relationship with Roberto; Josephine said what she says or does depends on Roberto's temper.

Roberto had participated in one or two individual therapy sessions. According to his therapist (Steven Monroe), Roberto was in denial of domestic violence or abuse or neglect in his home.

Roberto's and Josephine's visitation remained monitored every Tuesday and Thursday for an hour and a half or on Saturdays. O.D. monitored the visits (about 47 since the last hearing) and reported no concerns.

At the October hearing, the Department requested and the dependency court granted six more months of reunification services.

In April 2010, the Department reported the children were now in the home of a nonrelated extended family member (Ruby C.). The children had adjusted very well to living in her home, were well cared for and appeared very happy. Justine's therapist

(Susana Kim) reported Justine had been diagnosed with Mood Disorder and Sexual Abuse of a Child.

Soon after the last hearing, Josephine had stopped attending her counseling sessions. When the social worker tried to speak with her about the domestic violence issues while standing outside, Josephine got very nervous, repeatedly looking up and down the street. She said she was not sure she could keep Roberto out of the home if the children were returned to her. The social worker urged her to continue with counseling, but Josephine said she and Roberto were getting along and she would tell him to stay away if the children were returned to her. According to Ron Rose of the Center for Prevention of Family Violence, Josephine continued to attend a domestic violence support group.

Roberto was not participating in any sexual abuse perpetrator groups or any other services as of December. He had been addressing anger issues in individual counseling but continued to refuse to acknowledge he had been inappropriate with Justine.

Roberto and Josephine said they had separate residences one mile apart but said they were still together. Roberto said he would move out if the children were returned to Josephine. The Department reported no medical concerns for Joseph, who appeared to be a typical four-year-old, and he was not a Regional Center client.

Visitation remained monitored, twice a week. Ruby C. said there was a lot of interaction with Joseph and the children said they ate and watched television during visits.

The Department recommended termination of reunification services and set the matter for a section 366.26 hearing to terminate parental rights. The matter was set for a contested hearing.

For the May hearing, the Department reported there had not been much progress with the parents' services. Roberto was attended weekly individual counseling but only

recently located a sexual abuse perpetrators group; Josephine was not enrolled in any services at that time.

At the contested 12-month status review hearing in May, as requested by Joseph's attorney, the dependency court ordered termination of the parents' reunification services and set a section 366.26 hearing.

In its report for the September hearing, the Department advised the court the children remained placed with Ruby C. She and her husband were interested in becoming the children's legal guardian, and the children agreed with that plan. The hearing was continued for preparation of guardianship documents.

However, in October, the dependency court was informed that Ruby C. was ill and could not become the children's legal guardian. The court ordered a permanent plan living arrangement for the children.

In November, the Department reported the children remained with Ruby C. She was willing to keep the children with her until the Department could find another placement but was unable to keep them long term. Joseph was in kindergarten by then and reportedly a happy, talkative child. The parents still had monitored visitation twice each week.

As of the next status review hearing, the Department reported the children were living in separate foster homes. Ruby C. was unable to wait until a foster home was available for both children together. When an opening came up in Joseph's foster home, Justine did not want to move there from her placement. Joseph and Justine were able to see each other during the weekly family visits.

Joseph was doing well in school and said he liked his new foster home. He attended individual counseling on a weekly basis and remained developmentally on track—a soft spoken and quiet but happy child. Joseph enjoyed visits with Roberto and Josephine but Justine said she was uncomfortable talking with her father. Visitation remained monitored. Josephine was still not enrolled in counseling and it appeared

9

Roberto's phone was disconnected. A foster family agency social worker reported Roberto had been verbally aggressive with Josephine during a visit in April and said Josephine had told Justine about Roberto's mistress. The Department continued to look for an adoptive placement where Justine and Joseph could be together.

As of November, both Justine and Joseph were in new foster homes but still had not been placed together. Joseph remained in weekly individual counseling and seemed happier and more talkative in sessions. He said he enjoyed visiting with his parents; although Josephine attended all of the visits, Roberto did not.

Joseph was being assessed for adoption by his current foster parents (Ana and Carlos O.) Justine's foster mother said she could remain with her for as long as she needed. The Department recommended and the dependency court set a section 366.26 hearing for Joseph.

In February 2012, Josephine filed a section 388 petition as to Joseph (attaching several supporting documents), alleging she had attended 21 sessions addressing domestic violence and child abuse and prevention. She said she had completed domestic violence and parenting classes, had divorced Roberto and was renting a new place for herself and the children. She said she had never missed a visit, wanted unmonitored visitation and to regain custody of the children. The dependency court set Josephine's petition for hearing at the time of the section 366.26 hearing in March.

In its report for the March hearing, the Department said Joseph had been given a "psych" referral following his August medical examination. He had been hospitalized for a night for vomiting and an unrelated eye infection. He was in second grade with no special education needs; he continued in therapy. He had been in seven different placements.

Joseph then continued to vomit several times a week, complained of stomach pains and was having trouble in school. His foster parents had become ambivalent about

adopting and wanted assurance he did not have serious mental health issues. The Department requested more time to assess the situation.

Meanwhile, regarding Josephine's section 388 petition for modification of the court's prior orders, the social worker tried to visit Josephine at her new address, but Josephine said she was moving to another apartment and did not have the address. Josephine said she would call with it but did not. The social worker went to the address Josephine had provided to the dependency court but learned she had left that address two months before. Josephine's therapist reported that Josephine had disclosed Roberto had yelled at her the week before for leaving her drink at a restaurant. The Department expressed concern at the extent of contact Josephine continued to have with Roberto although she said she had divorced him, and she had not provided a copy of a divorce decree. She continued to visit the children with Roberto. Regarding the reported argument, Josephine said it was just Roberto's usual tantrum." The Department did not believe Josephine was ready for unmonitored visitation.

Later, the social worker was able to see Josephine's "new address" where she said she lived with another man, and Roberto was okay with that. She said he did not know her new address but when asked if he still picked her up for visits, Josephine asked if the court was "ok with that[.]" When the social worker reminded her she had represented she was keeping the address confidential, Josephine said, "Ya, ok then he doesn't come here." About the residence where she had not lived for two months, Josephine did not answer when asked where she had been living instead.

In March, Justine's foster mother reported Justine no longer wanted to visit with Roberto and was not sure her mother could keep him away from them. Justine said Roberto still controlled Josephine and they continued to argue. Joseph had not attended his most recent visit because he was afraid of Roberto and did not want to see his parents argue.

11

The Department noted the case had been pending since September 2008, but the parents had made "little or no progress towards their case plan goals." Josephine, who was still unsure about the sexual abuse allegations, had been evasive about her living arrangements and continued to allow Roberto to verbally and emotionally abuse her.

Josephine withdrew her section 388 petition and the matter was continued for two months. The Department was ordered to arrange separate visits for Josephine and Roberto with the children, with discretion to liberalize Josephine's visits.

In May, the Department filed a supplemental report indicating Joseph had been referred for a psychiatric and psychological evaluation. His therapist opined Joseph's current symptoms of enuresis and vomiting were related to anxiety, which had increased because Joseph was being bullied at school. Upon learning Joseph might need to attend therapy more than once a week, his foster parents said they could not meet his needs because of their work schedule. Joseph spoke English but his foster parents' English was limited so communication was difficult. They said Joseph could stay in their home until he had been evaluated.

Joseph said he wanted to be in another foster home close to Justine. The Department recommended a continuance to identify an adoptive home for Joseph. The section 366.26 hearing was continued to September.

Over his parents' objection, the dependency court ordered the administration of psychotropic medication previously approved by the court, noting the documentation indicated Joseph needed it and said he was doing fine with it.

As of the June status review report, Joseph remained with Ana and Carlos and wanted them to adopt him. He understood he could not live with Josephine at that time, but said he wanted to live with her when he turned 17.

After talking with his wife, Josephine's cousin R.T. said he would adopt Joseph, then move to the Philippines and place Joseph with his maternal grandmother. When he was told he would have to be the one to care for Joseph if he adopted him, R.T. said

12

he could not adopt him. Josephine knew of and did not see any problem with the plan, saying "Then I can go to there too and live with him."

In June, the Department was ordered to address the possibility of unmonitored visits for Josephine with Justine but reported in July Josephine would raise case issues and spoke negatively about Roberto during the monitored visits. Roberto and Josephine gave the social worker declarations denying the domestic violence (Josephine said she had lied to qualify for free shelter) and sexual abuse. Justine told the social worker Josephine did not want to accept that the abuse had happened, and the Department recommended against unmonitored visitation.

In a "Last Minute Information" report, the Department informed the dependency court it had received an affidavit—allegedly from Justine, stating she had lied about the abuse and had been tricked into saying things that were not true by the court. Contrary to the affidavit, however, Justine's foster mother told the social worker Justine had told her about the abuse; she did not know anything about the affidavit and said Justine always gave her foster mother anything she wanted to be mailed. The Department suspected the parents had forged the document.

In July, through her attorney, Justine told the court she had signed and sent the affidavit, but the dependency court had questions about its authenticity. Justine was happy in her current placement, enjoyed sibling visits with Joseph and wanted to remain in her placement. Joseph's attorney indicated Joseph also wanted more visits so the dependency court ordered sibling visits at least three times per month or more.

In September, the Department reported Joseph (now seven) had been referred to the placement and recruitment unit in June to find a new placement. Joseph had been diagnosed with generalized anxiety disorder and enuresis, and his psychological evaluation was forwarded to help the placement unit to find an appropriate match for Joseph. In July, the placement unit had located Mr. and Mrs. K., a "fost-adopt" family who appeared to be an appropriate match. Joseph was introduced to Mr. and Mrs. K. at a

pace appropriate with his emotional needs and in early August, he was placed in their home. He was happy there and wanted to live there forever. The Department assessed Joseph as adoptable and recommended terminating parental rights; the adoption planning recommendation was set for a contested hearing.

For the contested hearing, the Department reported that Mr. and Mrs. K. had an approved adoption study; Joseph continued to have visits with Roberto and Josephine, which caused him emotional distress as evidenced by enuresis following the visits and at night. Josephine and Roberto submitted declarations from themselves and others, including a legal secretary, O.D. and a paternal uncle, disputing the abuse allegations and requesting denial of the adoption plan.

In November, Josephine filed another section 388 petition, alleging she had separated from Roberto and had been living apart from him for almost a year. She said she had finished domestic violence classes, had over 40 sessions of individual counseling, attended some group counseling and had visited Joseph consistently. She provided no documentation in support of her petition. She requested more reunification services or Joseph's return to her care, asserting she and Joseph had a strong bond that would be destroyed by adoption and said he had special emotional needs; she said she would provide a stable home for him. The dependency court denied Josephine's petition without a hearing, stating that Josephine had not identified any new evidence or a change of circumstances and the proposed order was not in Joseph's best interests.

The Department reported that, after the July hearing, Justine had told the social worker she had lied about writing the affidavit and she had never seen it before; Josephine had told Justine about the document and told her to agree to all of it so Joseph would not be adopted. Although she had been instructed to speak English during the monitored visits, Josephine had told her about the document in Tagalog during a visit. When the social worker asked Justine if Roberto had sexually abused her, she said, "Yes[,] he did. If it were not true then why would I not want to have visits with him. It

14

is true, but they wanted me to lie about it." Roberto and Josephine had disappointed Joseph with promises they did not keep; for example, they promised to take him to Disneyland for his birthday but failed to show up for that visit.

When the social worker told Roberto and Josephine she knew Justine had not written any affidavit, Roberto said she had written it; Josephine said a friend had written it but Justine had signed it. When the social worker said she knew Josephine had pressured Justine to agree with the affidavit and it would not change anything, Roberto started yelling at her, got close to her and pointed his finger at her, calling her a liar and telling her she had better "watch out." Josephine looked down at the floor, saying, "No, no, no." When Roberto left, Josephine apologized but insisted Justine had written the affidavit. She said, "I have suffered so much because of this, he does this and I suffer. These past years have been very hard on me, on my job." When the social worker said the years had been hard on the children and she had been unfair to Justine in forcing her to deny the allegations, Josephine could not understand why Roberto had never been arrested if the allegations were true. Roberto returned to the room at that point, and when a security guard followed, Roberto yelled at him. Later, Roberto called to apologize, claiming he never acted like that and just got mad.

Regarding the process of introducing Joseph to Mr. and Mrs. K., the Department reported Joseph had had a monitored visit with them and their seven-year-old son in July. He was hesitant at first, but with Mr. K.'s encouragement, became comfortable and played with the family. He really liked the family and wanted to move to their home. He asked for his parents' contact information to stay in touch with them. At another visit, Joseph appeared emotionally stable and excited to have a family. The social worker was present for Joseph's first overnight visit with the K. family, and they asked appropriate questions to help Joseph with his routine and enuresis. His foster mother told the social worker Joseph had been "trying really hard to make sure he does not wet his bed at night"

15

so he would not have to wear a diaper when he spent the night with the prospective adoptive parents. There were no problems with the visit.

When Mr. and Mrs. K. spoke with the social worker in August, they said Joseph (now placed with them) was doing very well and they were very happy to have him. They were working with him so when he started school, he would not have accidents but said they would send an extra set of clothes with him just in case. During dinner the night before, he told them he wanted his last name to be K. When the social worker spoke with Joseph alone, he appeared very happy and comfortable. He showed her his new clothes, pictures and supplies. He referred to Mr. and Mrs. K as "mom" and "dad" and said he now had a brother.

The social worker met with Justine in August. She was very happy for Joseph in his new home with people interested in adopting him. She said she had had a bad childhood and understood why he was being adopted. She was happy in her foster home. She said, "If I was still living with them, I would definitely not be happy. I'm happy here and I'm glad that Joseph has a good home too." By all accounts, Joseph was increasingly happy and progressing well. Justine who was visiting with Joseph once a month because of her busy scheduled noted how happy Joseph was and was "ok with" Joseph being adopted because the K.'s were a good family. She was happy they were going to let her visit Joseph. Mrs. K. was a teacher at Joseph's school and said he was above average in math and science; she doubted he needed Regional Center services as he was not developmentally delayed. Joseph was happy with the K.'s, and the K.'s planned to adopt him.

In October, Josephine met with the social worker and said she had complied with the court's orders and would not let her children be adopted. Roberto said he had not completed his case plan because he could not afford it; the social worker provided referrals. After an October visit with his parents, the K.'s reported Joseph had regressed and had been wetting his pants. Mr. K. communicated with the social worker on a daily

basis about Joseph, and he had made appointments for Joseph with a urologist and a psychiatrist.

When the social worker visited Joseph in December, he seemed to be doing well and was not having any problems. He was seeing a dentist to address care he had not received in the preceding years and was going to the pediatrician to see if he had food allergies. He had joined cub scouts and was playing basketball at the YMCA. He had not visited with Justine or his parents that month.

Joseph reportedly had a strong bond with the K.'s. He still wanted them to adopt him and they wished to adopt him as well.

On January 8, 2013, at the contested section 366.26 hearing as to Joseph, Justine's counsel advised the court she would not be participating in the hearing. Other than its reports prepared prior to and for the hearing date, the Department presented no further evidence. Roberto testified he had last visited Joseph in October. He said he visited once a month for six months, which he said was as much as "they" allowed. He said he never missed a visit. He talked to Joseph, showed him pictures and played with toys.

Josephine said Joseph was removed from her custody when he was three. Before October, she said, she had visited Joseph once a week and Justine had been at the visits, but after he was placed with the K.'s, visits were reduced to once a month. She said she had a very close relationship with Joseph.

In closing arguments, Roberto's counsel argued the beneficial parent-child exception applied and breaking Roberto's bond with Joseph would be detrimental. He questioned whether the K.'s would continue to care for Joseph if he did not qualify for higher ("F-rate") funding. Josephine's counsel also argued the parent-child exception applied in Josephine's case as well. Joseph's counsel asked the dependency court to follow the Department's recommendation. Although Joseph had anxiety, he said it was understandable considering all he had experienced in his life. He was now in a stable home with foster parents willing to adopt him. Even if Joseph's parents had visited more,

visits were monitored, and any bond was of the sort shared by any number of people but did not outweigh the permanence Joseph had a chance to achieve if freed for adoption. The Department joined in these comments, emphasized how well Joseph was doing with the K.'s and they occupied the parental role in Joseph's life.

Noting that Joseph was doing extremely well with the K.'s, the dependency court found by clear and convincing evidence Joseph was adoptable and, finding no exception applied to impede the adoption, terminated Roberto's and Josephine's parental rights.

Both Josephine and Roberto appeal.[1]

## *DISCUSSION*

**The Dependency Court Did Not Abuse Its Discretion in Denying Josephine's Petition for Modification of the Court's Prior Orders.**

According to Josephine, the trial court abused its discretion in summarily denying her section 388 petition. We disagree.

*Standard of Review and Applicable Law*

Pursuant to subdivision (a) of section 388, a parent may petition the dependency court for a change of order "upon grounds of change of circumstance or new evidence[.]" The dependency court shall order a hearing if it appears the best interest of the child will be promoted by the proposed change of order. (§ 388, subd. (d).) If not, the court may also summarily deny a section 388 petition ex parte. (Cal. Rules of Court, rule 5.570(d)(1).) The petition must be considered within the context of the entirety of the dependency court proceedings. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) To trigger

---

[1]     According to the June 17, 2013 minute order, Joseph and the K.s were receiving permanent planning services, and the matter was set for further review in November. It was anticipated that Joseph's adoption would be finalized by that date, and it was further ordered that Joseph would continue to receive age appropriate mental health services and have sibling visits with Justine (who was also in a permanent placement). Pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a), we take judicial notice of this order. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1487, fn. 3.)

a hearing, the parent must make a prima facie showing that there is a genuine change of circumstances or new evidence and that changing the existing order is in the child's best interests. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

A dependency court's denial of a section 388 petition without a hearing is reviewed for an abuse of discretion. (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250.)

In a prior section 388 petition (February 3, 2012), Josephine claimed she had attended 21 individual counseling sessions, had completed domestic violence and parenting classes and was living apart from Roberto; she also said she had consistently visited Joseph.[2] The dependency court set her petition for hearing, but before the dependency court could rule on it, Josephine withdrew the petition on March 12.

Notably, it had been reported in the Department's interim review report for the March 12 hearing that the truth of Josephine's claim she lived apart from Roberto appeared questionable. She was evasive about where she was living and, even if she had a separate residence, Roberto knew about it although it was supposed to have remained confidential and he had continuing contact with her. Moreover, Roberto still controlled Josephine and they argued during monitored visits with the children. Joseph had not attended his last visit because he was "afraid of [Roberto] and did not want to see [Roberto and Josephine] argue with each other." Furthermore, the case had been pending since September 2008 but Josephine was still unsure whether the sustained allegations of Roberto's sexual abuse of Justine were true. Therefore, the record did not support the

---

2    In support of her first petition, Josephine submitted documents including a letter dated November 15, 2011, regarding four individual counseling session she had attended in March *2010*, in which the therapist said Josephine "appeared very intimidated and scared of her husband who continued to emotionally, verbally and economically abus[e] her[; a]though [she] was getting more insight about her victimization, her helplessness at that time prevented her from totally being prepared to protect herself and her children from further abuse." Josephine submitted another letter documenting her attendance at 21 sessions beginning on April 13, 2011, focusing on domestic violence, child abuse and prevention and parenting skills, and indicating Josephine was "very cooperative" and "eager to participate."

conclusion Josephine was in any better position to protect Joseph from Roberto than when the children were first detained.

Then, eight months later (on November 20), Josephine filed another section 388 petition—with no accompanying documentation to support her claim of changed circumstances this time—and with allegations almost identical to those set forth in her prior petition. By this time, it had been more than four years since the children were initially detained and more than two years after reunification services were terminated. Josephine said it was in Joseph's best interest to return Joseph to her or to provide her with more reunification services because Joseph had a "strong bond" with her that would be destroyed if he were adopted, he had "special emotional needs" and had only been in his current foster home for a few months.

According to the Department's status review report dated June 19, Josephine's visits were still monitored. As of the Department's July 10 progress report, Josephine continued to deny domestic violence and sexual abuse had even occurred. Instead, she sought to have her cousin take Joseph back to the Philippines so she could be with him there and manipulated Justine into recanting the sustained sexual abuse allegations, and it appeared she and Roberto were still together although he had not addressed his domestic violence issues in therapy and continued to have anger issues.

Josephine failed to show how maintaining the bond she had with Joseph was in Joseph's best interest. "The presumption favoring natural parents by itself does not satisfy the best interests prong of section 388." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 192.) In determining whether the requested change is in the child's best interests, the child's interest in stability must be "the court's foremost concern." (*In re Anthony W., supra,* 87 Cal.App.4th at p. 251.) Although Joseph had only been in his current foster home a short time and had special needs, he identified Mr. and Mrs. K as his father and mother and spoke of their son as his brother; Joseph told the social worker he "would like to 'live with them forever.'" Mr. and Mrs. K. had taken steps to address Joseph's special

20

needs by initiating the process of enrolling him in counseling.  On this record, we find no abuse of discretion in the summary denial of Josephine's second section 388 petition. (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250.)

**The Record Supports the Dependency Court's Termination of Josephine's and Roberto's Parental Rights.**

*Substantial Evidence Supports the Dependency Court's Determination Joseph Is Adoptable.*

According to Roberto, the record does not support the dependency court's determination Joseph is adoptable.  As an appellant, it is Roberto's burden to demonstrate the evidence was insufficient to support the dependency court's conclusion (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420), but he has failed to do so.

Clear and convincing evidence that it is likely "adoption will be realized within a reasonable time" is required for a dependency court to find a child adoptable.  (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223.)  It is not necessary, however, for an adoptive home to have been identified in order to terminate parental rights.  (*In re I.I.* (2008) 168 Cal.App.4th 857, 870.)  The question of adoptability focuses on the child's condition and whether his age or his physical or emotional condition would make it difficult to find someone willing to adopt the child.  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  Even if a child has special needs, an adoptability finding is properly supported if a prospective adoptive parent has been identified and it is reasonably likely the child will be adopted within a reasonable time.  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292-1293; and see *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154 [the fact a prospective adoptive parent expresses an interest in adopting a child provides evidence the child's condition is not likely to dissuade others from adopting the child within a reasonable time].)

Joseph was seven years old when he was referred to the Placement and Recruitment Unit (PRU) to find a new placement for him on June 8, 2012, but it was only one month later (on July 12) that Mr. and Mrs. K. were identified as a "fost-adopt family" for Joseph. On March 12, 2012, the Department had reported that Joseph was in therapy, but he had no developmental delays, was not a Regional Center client and had no special education needs. In addition to Mr. and Mrs. K, another family had expressed interest in adopted Joseph, and the adoption social worker identified Joseph as adoptable. Such evidence supports the finding Joseph was in fact adoptable. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1420-1421; see *In re Lukas B., supra,* 79 Cal.App.4th at p. 1154; and see *In re Sarah M., supra,* 2 Cal.App.4th at p. 1650.)

Furthermore, although Joseph had received a diagnosis of Anxiety Disorder and Enuresis—after suffering from a lack of permanency for the past five years, the record nevertheless supports the conclusion Joseph was adoptable. (See *In re Lukas B., supra,* 79 Cal.App.4th at p. 1151 [although the child "had begun frequently urinating on herself and at times would regurgitate when she was not ill," she was adoptable].) The record supports the conclusion that Joseph was a happy child, but he developed emotional issues after being moved from placement to placement. These issues were being addressed through medication and services to assist him with both enuresis and anxiety, and he was motivated to resolve these issues. In fact, Mr. and Mrs. K. reported Joseph had been making progress in their home and reiterated their interest in adopting him and providing him with the stability he needed. It follows that the dependency court's finding that Joseph was adoptable is supported by substantial evidence. (*In re Lukas B., supra,* 79 Cal.App.4th at p. 1154.)

*The Beneficial Parent-Child Relationship Exception and the Standard of Review.*

Having properly determined Joseph was adoptable, the dependency court was compelled, absent a showing of exceptional circumstances, to make findings and orders consistent with the strong legislative preference for adoption. (See *In re Jose V.* (1996)

22

50 Cal.App.4th 1792, 1799 ["Once the court determines adoption is feasible, the less desirable and less permanent alternatives of guardianship and long-term foster care need not be pursued"].) To defeat the legislative preference for adoption, the parent has the burden to demonstrate exceptional circumstances exist. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

Section 366.26 provides an exception to the general legislative preference for adoption when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; see also *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; see *In re Beatrice M., supra,* 29 Cal.App.4th at pp. 1418–1419.) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Factors considered in balancing the strength and nature of the parent/child relationship versus the security of a permanent home are: (1) the child's age, (2) the amount of time the child spent in the parent's custody, (3) the positive or negative effect of the interaction between parent and child and (4) the child's individual needs. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. 7.) To overcome the preference for adoption, a parent must demonstrate that severing his or her parental rights would deprive

23

the child "of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*Id.* at p. 466, original italics.) Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

As we stated in *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622: "For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination (see, e.g., *In re Autumn H., supra*, 27 Cal.App.4th at p. 576; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953), although at least one court has concluded that it is properly reviewed for an abuse of discretion (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1351). Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*).) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists, although section 366.26 does contain other exceptions—is, because of its factual nature, properly reviewed for substantial evidence. (*Id.* at p. 1314.) The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *Bailey J., supra,* 189 Cal.App.4th at p. 1315.) This "'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of

24

adoption," is appropriately reviewed under the deferential abuse of discretion standard. (*Bailey J.*, *supra,* 189 Cal.App.4th at p. 1315.)  We find the *Bailey J.* approach persuasive and apply its composite standard of review here."

**Roberto and Josephine Have Failed to Demonstrate that Termination of Their Parental Rights Would Be Detrimental to Joseph.**

*Josephine Has Failed to Demonstrate that a Continued Relationship with her Outweighed the Benefit the Children Would Gain from a Permanent Adoptive Home.*

Regarding the first prong of the beneficial parent-child relationship exception (regular visitation), generally speaking, Josephine maintained consistent contact with Joseph, but all visits were still monitored.  (See *In re Casey D., supra,* 70 Cal.App.4th at p. 51 [noting difficulty of demonstrating beneficial parent-child relationship when visits remain supervised].)

Moreover, Josephine failed to meet her burden as to the second prong of the exception.  Joseph was born in April 2005 but was detained from Josephine's custody in October 2008 and remained out of her custody until January 2013 when her parental rights were terminated.  Therefore, he lived with Josephine until he was three and a half, but remained out of her custody for the next four years before the termination of Josephine's parental rights.  In addition, during visits with Joseph, Roberto and Josephine continued to argue and he would experience enuresis following visits.  Josephine had promised Joseph she would take him to Disneyland for his birthday but did not show up for the visit.  Although he held his parents tight when visitation with his parents ended, there was no indication he had difficulty separating.  Furthermore, while Joseph had some special needs, it was Mr. and Mrs. K. who attended to them—arranging for therapy, taking him to a psychiatrist and urologist to address his anxiety and enuresis, taking to the pediatrician to rule out allergies, taking care of his teeth.  It was Mr. and Mrs. K who ensured he attended school and helped him to join in extracurricular activities.  Josephine had not cared for Joseph for more than half his life and did not occupy a parental role in

25

his life; Joseph wanted Mr. and Mrs. K. to adopt him and was excited to be part of their family. Josephine has failed to demonstrate error in the dependency court's rejection of her claim the beneficial parent-child relationship exception applied in this case. (*In re Andrea M.* (1999) 75 Cal.App.4th 1093, 1108; *In re Angel B., supra,* 97 Cal.App.4th at p. 466.) Even assuming substantial evidence would have supported the conclusion a beneficial parent-child relationship exists, the dependency court did not abuse its discretion in concluding the importance of Joseph's relationship with Josephine "in terms of the detrimental impact its severance can be expected to have on [Joseph]" did not outweigh the benefit to Joseph of being adopted. (*Bailey J.*, *supra,* 189 Cal.App.4th at p. 1315; *In re K.P., supra,* 203 Cal.App.4th 613, 621-622.)

**Roberto Failed to Demonstrate It Would Be Detrimental to Joseph to Terminate His Parental Rights.**

Roberto visited along with Josephine, but his relationship with Joseph was even more difficult than Joseph's relationship with Josephine. On at least one occasion, Joseph did not attend a visit because he said he was afraid of Roberto, and Roberto failed to demonstrate he occupied a parental role in Joseph's life. Meanwhile, as already described, Joseph clearly wanted Mr. and Mrs. K. to adopt him, and the record supports the dependency court's determination as to Roberto. (*In re Andrea M., supra,* 75 Cal.App.4th at p. 1108; *In re Angel B., supra,* 97 Cal.App.4th at p. 466; *Bailey J.*, *supra,* 189 Cal.App.4th at p. 1315; *In re K.P., supra,* 203 Cal.App.4th 613, 621-622.)

**The Sibling Exception to Termination of Parental Rights Did Not Apply in this Case.**

Pursuant to subdivision (c)(1)(B)(v) of section 366.26, the dependency court may determine it would be detrimental to terminate parental rights if there would be substantial interference with a child's sibling relationship. Under this provision, the dependency court is to consider the nature of the sibling relationship, whether the child

was raised with the sibling in the same home, whether the children share common experiences, whether the child has a close and strong bond with the sibling and whether ongoing contact is in the child's best interests when weighed against the benefit of a secure, adoptive home.  (§ 366.26, subd. (c)(1)(B)(v); *In re L.Y.L., supra,* 101 Cal.App.4th 942, 951.)

Justine and Joseph did not live together after the placement with Ruby C. failed. Justine's move from the foster home where she and Joseph had lived together was very difficult and confusing for Joseph and he worried he would have to move; when he was assured he could remain where he was, he improved.  Justine recognized Joseph's need for stability, saw that he was happy with Mr. and Mrs. K. and was happy for him.  She did not seek to interfere with Joseph's chance for permanence at the hearing to terminate parental rights, and it appears the siblings may well enjoy continuing contact.  In any case, the record does not support the conclusion (as Josephine urges) the trial court erred in rejecting the application of the beneficial sibling relationship exception to the termination of parental rights in this case.  (See *Bailey J*., *supra,* 189 Cal.App.4th at p. 1315; *In re K.P., supra,* 203 Cal.App.4th at pp. 621-622.)

### *DISPOSITION*

The orders are affirmed.



                                                     **WOODS, J.**

**We concur:**



      **PERLUSS, P. J.**                                     **ZELON, J.**